May it please the Court, Alan Haley for the appellants, Your Honor. There were two abuses of discretion committed by the Court below when it approved the recommendations of the monitor. First, it was arbitrary, purely arbitrary, to charge the Jorgensens with the full proceeds, every dollar, received from all 295 rugs while crediting them for the value of only 200 rugs that they picked up and resold. This makes the Jorgensens give away rugs for free. Well, weren't, as I understand what the lower court decided was that there's only 200 that went to the fund. The others were personal. Right. But they still charged the Jorgensens. The very first day that Trubose went into that store and bought $8,000 worth of rugs that the monitor later decided was not sold to the fund but to Trubose personally, that $8,000 was deducted from the investment made by the Jorgensens. So it's not right to credit them only with 200 rugs, say these are the only ones we find were sold to the fund. But we're going to charge you for every dollar the fund paid you, Mr. Trubose paid you, for all the 295 rugs. What that does is that takes money from the Jorgensens and distributes it, cuts their claim down so that more can be distributed to the rest of the fund. Let's, there are two questions, I suppose. One is, were the rugs sold to the fund, the 95, let's say. If they were, and the money came back to the Jorgensens, money came to the Jorgensens from the fund, that's easy, right? Right. If indeed the rugs were sold to Mr. T, and the money came from the fund. That's where all his money came from, yeah. So your theory would be, if he took the money out of the fund and paid it to the Jorgensens, well, that's fine. He just embezzled some money and paid it to them, but they're not responsible for the embezzlement. Right. Now, your theory, I took it, was that the rugs were actually sold to the fund, the 95, is that correct? Yes. All right. There's no difference. I understand. Okay. The argument made, I think, is they couldn't find the 95, and therefore, they couldn't have been sold to the fund, is that correct?  I submit, Your Honor, that's an oversimplification. The 200 rugs just happened to be easily found and picked up because Mr. Gerbose said, enough, I can't store any more of these rugs. Plus one they picked up from Mrs. Right. So, in other words, he had been taking these rugs, using them for his personal homes and things like that, treating them as an investment, I assume, of the fund. That's up between him and his conscience. But he was unable at this point to absorb any more rugs, so he simply asked the Jorgensen's, please keep these on your premises. We'll buy them and hold them as an investment, just as we did the other rugs. But the whole reason he hooked them in in the first place was telling them, I'm buying these rugs for my fund as an investment. Well, that's the question. Their point is, if I understand it, that because they couldn't find the other, I guess, 94 rugs. They never searched for them, Your Honor. I don't care if they searched or not. Because they couldn't put their hands on them or didn't put their hands on them, their theory is they could not have been part of the fund. Is that correct? All right. But I'm asking that that's their theory. I understand your position is, so what if you can't find them? That's not our problem. Well, my position is more than that. If White contend that they're not sold to the fund, then don't charge us with the proceeds. Okay. That's just money between us and Mr. Trebolse personally. Let me ask you another question, sort of a technical one maybe. Mm-hmm. There is a theory that if somebody invests money in one of these Ponzi schemes, what they're entitled to get back is essentially the cost of replacement to the person, not to somebody out in Never Never Land, but to the very person charged. Now, here we've got two things. You've got a retail price, I understand it, and you've got what you paid for them. Let's call it your basis for the moment. Right. Is there any evidence in this case from you or anybody else of what the cost of replacement would be if that is indeed the rule? Yes. To me, the cost of replacement is the, first of all, when they allow this only cost, they disallowed the freight and the shipping. You have to, I mean, and the duty. So you have to allow those amounts to replace the rugs, otherwise you can't get them in the country to begin with. And second, you have to allow a certain amount for overhead operation, keeping things in business to be able to order the rugs and have a place for them to arrive when they come. So you can't just go at bare cost or even below cost as they did here. Is replacement cost something that customarily includes the cost of business or the overhead? It would have to, otherwise the business can't stay in business. If all it does is Mr. Jorgensen closed up shop. No, no. He's operating. Yeah. But I'm just saying. Is there a marginal additional cost in replacing the set of rugs? I would say every business operates on that principle, Your Honor. That's how, in other words, it has to allocate. Well, let me put it in a different way. In dealing with replacement cost, and we're not in a territory that's well-explored and written about, so there's not a lot of authority, but I'm not familiar with the concept of including within replacement cost overhead. Replacement cost, it seems to me, more often refers to cost of product. In that case, you'd have whatever the current wholesale cost is that you've mentioned, freight and duties and so forth, but out-of-pocket costs. Is there any authority that would encompass within replacement cost the concept of overhead? No. To me, it's more of a common sense thing. I think the best analogy that you can use to understand what's going on, this is the difference in belief over value. The problem is when somebody puts a dollar into the fund, we have no trouble saying, OK, you put a dollar in. When somebody puts an oriental carpet in the fund, the whole question is, how many dollars did you put in? And so the analogy to this case would be as though, suppose my client were selling the fund Confederate dollars and getting full dollar value for those Confederate dollars, but they were in reality only worth 20 cents or whatever on the dollar. Then you – but there's a dispute over how you value what they actually put in the fund. The simplest way to handle that is to cancel the transaction, back out everything that the fund credited him with for those Confederate dollars and give him his Confederate dollars back. Well, I suspect everybody who invested in the fund would love to cancel their investments and get their full money back, but that's not going to happen. That's not what I'm saying, Your Honor. I'm not saying get their full money back. You cancel the transaction. In other words, you stop giving them credit for the full dollar on every Confederate dollar paid. You simply return them their Confederate dollars and say, here, you take them. You can deal with them. But you cancel that full dollar credit they got. We're not there yet, either. I mean, I understand your argument. It would have been better from your client's perspective and maybe in a universal concept if the trustee or monitor or whatever the title is had proceeded differently. But he didn't. He had to make incremental decisions as they went along. He decided in this case to liquidate the rugs. In retrospect, that may have been a bad judgment, but that doesn't entitle your client to go back and say in a different world we would have done it differently. Well, if it discriminates against us to benefit everyone else in the fund, that's what's unfair. I'll reserve the time for rebuttal. Mr. Zarro. Zarro for Michael Grassmuck, the monitor. May it please the Court. The district court was right when it approved the proposed treatment of the Jorgensen's claim. And the district court exercised its broad discretion and the wide equitable powers that it has in the context of an equitable proceeding. In this case, there was a monitor, not a receiver, but the – that was just a way to limit the powers of the receiver at the commencement. If they sold or whatever at least the 95 rugs to the fund, as they claim, they say it's just like the other 200, except we didn't – we stored the other 200 and he took off the 95. Why is it fair and equitable, just because you can't find them or didn't look for them, why is it fair and equitable to say, oh, well, those had nothing to do with the fund? I believe that when you started the question, you said he sold them to the fund. I think their allegation was that he sold them to Mr. Trabolsi. Alito, what's your client's position? Our client's position is that, number one, we can't find the rugs. Number two, if there are ledger entries that reflect payments from the fund, not from Mr. Trabolsi personally, from his separate property if he had any, from the fund, to pay for some of those 95 rugs. So there was at no time – so that we did not penalize, as they're suggesting, them for rugs that Mr. Trabolsi – that they sold to Mr. Trabolsi. Well, sure you did, because you took out the subtraction part, including all the money paid for all 295 rugs. We – but the fund paid for – if anyone paid for those rugs, it was the fund's money. On the credit side of the ledger, he's got 200 rugs. On the debit side of the ledger, he's got 295 rugs. It's not the same. Well, there's no – because there's no – we credited him the full amount of money that came – all the money that came to him, the costs of the rugs that we could identify, that went – all 200 of them. No, no. We're talking about 295. Correct. You took out the money for the 95 also. Because that money came from the fund. And so did the money for the 200? Correct. So it all came from the fund. It all came from the fund. Yes. And so – and they say, sure it came from the fund. We sold it to the fund. And you say, oh, no, you didn't, because – because we can't find the 95. And because you claim you sold them to Mr. Trabolsi. Well, but that makes him the insurer for what Mr. Trabolsi, or whatever his name is, did. I mean, Trabolsi bought groceries, too. Do you go to the grocery store and take back the money that he paid over to the grocery store just because he happened to have embezzled that money from the fund? In the general context, the answer is, of course not. We would not do that. However, in the context of this particular claimant, we had to look at it. In the context of this claimant, you credited him, in terms of the cost, what he paid for 200 rugs, and you took out of that what he received for 295 rugs. Somehow, I don't understand how there's equivalency there. How come you don't have the same number of rugs on both sides of the ledger? Because all of the money came from the Fahy Fund. Okay. If you say that, that's fine. But I think you have to be consistent. Then he's entitled to say, well, what did it cost me to come up with 295 rugs? Correct. And on the other side of the ledger. But is that what happened here? Part of the problem, I think the problem, the questions you're asking aren't good ones, and the ones that are important are. Well, let's try an answer, then. Is that what happened here? Did he get credit for the cost of 295 rugs? He did not get credit for the 95 rugs in terms of the cost. Why not? For several reasons. One, the we could not definitively establish that he came out of pocket to pay for the 95 rugs, the accounting records that we have been presented, and the record. Where is that stated anyplace? I believe in our brief. I'd have to go back and look. I don't know off the top of my head. Because so far, everything seems to have been taken exactly from the numbers they provided. And nobody really thinks that 95 rugs came out of clear blue sky and they didn't pay anything for them. So the notion that we couldn't entirely establish, so we're going to act like those rugs were free, a little hard to understand. It was the problem with it is we couldn't have, we didn't have accounting records that would establish. Do you think those rugs were free? I don't believe those rugs were actually purchased and sold. That's my opinion. But you were willing to take the money out of, on the other side of the ledger, all the money that he received. Supposedly. We ended up taking a look at what cash came from Fahey Fund, what cash came out of Mr. Jorgensen's pocket that he could show that he actually spent. Who spent? The Jorgensen's spent. You don't think he bought the 95 rugs?     So you don't think he spent the money on the 100 rugs, is what you're saying? We don't have any documentation, we did not have documentation to firmly establish that he spent that money. You have documentation that he spent the money on the 200 rugs. We could tie those things out. Tie them to what? To his records? To Jorgensen's records? To the records that he provided. This was his burden to establish, to show us that he purchased 200 rugs or 290 rugs or whatever, and to show us what the cost to him of that was. Did he get any, I'll call it stock for the moment, credit on the books when the 95 were sold or only on the 200 were? I mean on the books of the fund. I don't know the answer to that question. On the books of the fund, I mean. Correct. I don't know the answer. Supposedly what was happening is they were giving him these things at cost and they were getting stock or whatever credited on the books of the fund, which would tend to indicate that they're the same as the others, that that was true. But we don't know. We don't know. I don't have that answer. We – the records that were provided indicated that there was some, as far as we can know, way to value what it is that he – how he came to the numbers that he claimed to come to, which goes back to the Court's earlier comment that – concerning how to judge what to give this person, that should you afford somebody more than their actual out-of-pocket costs versus, in this case, what was a sort of made-up profit margin. This wasn't as if he went into Sears and he said, here's – I want to buy that sofa. Here's $50 and a stock certificate. But why isn't – if they had records that would satisfy you, they paid, say, $500 and – well, let's say on the 200, $360,747 for the rugs. Why is it that they didn't get the cost of transporting those rugs and tax and such added on to the – I mean, not tax, it's duties. Because it came down to – it came down to that was simply an additional claim on top of their out-of-pocket costs. Wait a minute. We didn't deduct the cost. Wait a minute. If I'm a – if I'm buying rugs, if I'm a wholesaler or whatever and I'm buying rugs in, let's say, Camp Diamond, Iran, I'm buying them in Munich and I'm giving the seller $100,000 for the rugs. And to get them home so I can put them in my store, I've got to pay another $15,000 for shipping and duties. Why do you think that the $15,000 isn't part of my out-of-pocket costs for those rugs? It could be if you actually paid it. And what we ended up doing is looking at what was actually – what he – Mr. Jorgensen could show that he actually paid in cash. So he had no records for the duties or the transportation. Is that correct? He had invoices that reflected those, but we couldn't tie those to accounting records that showed that that money was actually spent. So you think maybe he stiffed the government for the duties, right, and he got his rugs anyway? No. I think that his accounting records were so poor that we can't – we couldn't reasonably rely on the numbers that showed up on pleadings on pieces of paper such as the invoice 104, that instead of trying to rely on handwritten scribbles on pieces of paper that looked like this, we looked to the actual dollars that we could – that they could show us that they actually spent. So he came – that he actually came out-of-pocket. And instead of relying on his claim that he spent $1,034,000, that these rugs were valued at $1,034,000, we valued them at the actual cost, the $530,000 that he actually spent to buy the rugs. I'm looking at your brief and trying to figure out the calculations again, and there appears to be one step where you took the total actual cost for the 295 rugs. And you reduced it by the fraction of 200 over 295. Yes. And so they have, in fact, documented costs which you've accepted for the larger number of rugs. You just reduced it because you're only going to give them – recognize the cost for the 200. Is that correct? That's correct. And yet, when you took out the money that they had been paid, you took out the money    that had been paid for all 295 rugs. Those were actual dollars with no fractional reduction. Is that correct? Correct. So this isn't – that's not an accounting problem. That's an actual adjustment made because you've only got 200 rugs on one side of the ledger and 295 on the other. Right. Because – How is that right? Because we did not believe that if Mr. Trabolsi personally bought rugs – You did not believe – No. If he personally bought those rugs, the 95 rugs – Well, I don't care who bought it because either way doesn't have to work out the same. No, because I don't think that Mr. Jorgensen would be entitled to be repaid for rugs he sold to Mr. Trabolsi personally. He's not asking to be repaid. Your credit – you're taking out from what he's being paid what he was paid for those 95 rugs. No, we're – I especially disagree. We're reducing his claim by the amount of money that the fund lost buying rugs for Mr. Trabolsi. But it didn't buy them. You said – You told us Mr. Trabolsi bought them. You said he bought them. It's got to be one or the other. If Trabolsi bought them, I don't know why it's Mr. Jorgensen's risk that Trabolsi embezzles money from the fund. And if the fund bought them, I don't know how you can reduce the cost. It is Mr. Jorgensen's risk to know who he's doing business with. Yeah, he is. He's doing business with Trabolsi. He's paying him cash money. Now, Trabolsi's embezzled that from the fund, but why is that Jorgensen's problem? Well, because Mr. Jorgensen entered into a business relationship with Mr. Trabolsi. So did Safeway. Is Safeway at risk because Trabolsi's embezzling? Mr. – no. Safeway is not. But Mr. Jorgensen entered into a far more involved relationship with him. And the district court judge agreed with us on this point. Well, I understand that. But your problem is that right now I don't. I have no ability to understand how it's 200 on one side and 295 on the other. I just don't see how you make him be responsible for what Trabolsi does. I make him be responsible. And if I could, Your Honor, read from the record. This is what the district court judge concluded. Because I think it's important in hearing all of the evidence and reviewing the evidence before, this is what the judge concluded about Mr. Jorgensen's relationship with Mr. Trabolsi. This is on page 26 of the record from the hearing on July 9th. The court. Maybe your guy was in on it. It sounds like it. I mean, why would anyone think investors would want to buy 300 runs or 295 runs? Your Honor, this is Mr. Haley. Your Honor, if you are in the rug business, that's a sizable investment. The court, please, come on. Farther down the page, the court states, or Mr. Haley states, but at the same time he has to buy them twice as a result. The court states, I don't know. The imagination of criminals never sleeps in coming up with schemes. Well, yeah. And where in the world does the court have a scrap of evidence that these people were engaged in fraud with Mr. T? The court. He just, oh, well, he's probably saying, oh, well, we all know about rug dealers. And so I don't trust these guys. They're just crooks along with Mr. T. It sounds like that's what he's saying. There's no evidence of that that I can see in this record. And I've looked at most of it, I think. What there is evidence of is that he was in business with him, that he went into business with him to buy, go out and seek out rugs for Mr. Trabolsi and barter those rugs for interest in this Fahy Fund. And so he is different than Safeway. And he shouldn't be allowed his profit. I mean, I understand on one level the Jorgensons may have overreached. They clearly did overreach to the extent they were trying to get their so-called retail price. No reason they should profit based on this. But now we're going back the other direction. And frankly, I look at your brief and I get the sense here the monitor offers up to an argument that suggests we're trying to be fair to everybody. We're trying to treat him like everybody else. And now you're telling us something very different. You're telling us he's singled out because he's part of the scam. And so we're just not going to pay him like we pay everybody else. I don't see that being consistent. I don't see the evidence that supports any factual findings. I see observations by a judge for whom I have the highest regard. But I don't see any factual findings or evidence that support the conclusion that we're going to single this guy out and pay him less because we think he's part of the scam. If that were the case, he should have been zeroed out. But he wasn't. The only difference is that he's singled out because of the no other investor did business in this fashion. This investor, this person, did two transactions. He worked with Mr. Trubolsi individually. And if Mr. Trubolsi was buying rugs individually, he should have paid for them individually. And the other thing is he did. Well, maybe he did. But you're saying because he took the money out of the fund, you're not going to treat it that way. That's correct. And I don't know why a third party dealing with somebody who purports to be buying them individually is at risk because Mr. Trubolsi is embezzling from the fund. I don't see how Jorkinson is different from Safeway in that transaction. We just respectfully disagree. We think that the Mr. Trubolsi. When individuals in these receivership cases transact personal business, they are not entitled to claims against the receivership or the monitor estate. And that is consistent in almost all of these cases, and it's consistent with the proof of claim that was filed by these people and the proof of claim order that was entered by the court, that claims against the individual were not paid out of the estate. But where were they claiming against the individual? They've already been paid by the individual. Their problem is that you're taking out from what they're getting back for the 200 rugs supposedly sold to the fund, you're taking out from that what the individual paid to them for the 95 rugs. We're taking out what the we're counting in the MIMO calculation money that came to the individual from the fund, not from the individual. And that the assets went to the individual. I guess we have the concept. Thank you. Briefly, two references to the record, Your Honor. At page 113 is the admission. We reconciled the invoices you sent us tying the cost of the goods sold of the rugs that Magic Carpet sold to the Fahey Fund. You provided us with 44 invoices detailing 295 rugs sold to Mr. Trubolsi for a total of 1 million, et cetera. Your reconciliation showed the cost of goods sold of these rugs to be 538,965. After performing an audit, we found the actual cost of goods to be 530, disallowing the, of course, the freight and the duties. And second ---- Which page number was that? That was page 113. Oh, 13. Okay. That's a communication from the ---- I'm looking at 115. My fault. Go ahead. Okay. And then the second, even the Court, Your Honor, below, after the passage that was quoted when I strongly objected on the same grounds that there's no evidence, I said we turned over everything to the monitor. If the monitor had wanted to charge us with being in on the scheme, he's had access to every single record, and he's not made that claim. The Court then said, all right, maybe your guy is innocent. So that's just pure smear character. We submit it, Your Honor, and hope that you will equalize the injustice done here. Thank you. Thank you. We thank both counsel for the argument. The remaining cases on today's calendar have been submitted on the briefs. So this one and those two are submitted, and we are adjourned. All rise.
judges: Wallace, Fernandez, Clifton